UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

EDWARD A. FITZPATRICK, III,

    Plaintiff,

v.                                             Case No. 18-cv-0541-bhl

MILWAUKEE SCHOOL OF ENGINEERING,

    Defendant.

## DECISION AND ORDER GRANTING
## DEFENDANT'S MOTION OF SUMMARY JUDGMENT

      On April 6, 2018, Edward A. Fitzpatrick, III filed a complaint against the Milwaukee School of Engineering (MSOE), alleging that MSOE violated the Dodd-Frank Act's anti-retaliation protections for whistleblowers when MSOE fired him after he reported MSOE's alleged mishandling of a trust to the Internal Revenue Service (IRS) and Securities Exchange Commission (SEC). (ECF No. 1.) On August 13, 2018, Fitzpatrick amended his complaint to add a state law wrongful discharge claim. (ECF No. 15.) MSOE answered both complaints, insisting it had lawfully fired Fitzpatrick, not because of his alleged whistleblowing, but because of a documented history of poor performance. (ECF No. 7, 18.) MSOE also denied any improper handling of trust funds.

      After discovery closed, MSOE moved for summary judgment on both counts of the amended complaint. (ECF No. 28.) MSOE contends Fitzpatrick's whistleblower claim fails because there is no causal connection between Fitzpatrick's reporting to the SEC and his termination, and because MSOE had legitimate, non-pretextual, reasons for terminating him. With respect to the state law wrongful discharge claim, MSOE contends that it cannot be liable because the record does not show any alleged public policy violations sufficient to trump Wisconsin's overall at-will employment doctrine. Fitzpatrick insists that factual issues persist, entitling him to a trial on both counts. (ECF No. 37.)

1

The Court held a status conference on October 29, 2020. Consistent with Fed. R. Civ. P. 56(f), the status conference notice asked the parties to be prepared to address an additional issue: whether Fitzpatrick qualified as a "whistleblower" under the Dodd-Frank Act, given that his IRS and SEC reports did not appear to allege a securities law violation. (ECF No. 67.) At the status conference, the Court gave the parties an opportunity to make updated summary judgment arguments and to address Fitzpatrick's qualification as a whistleblower. Based on the parties' arguments and the record as a whole, the Court now grants MSOE's summary judgment motion and dismisses Fitzpatrick's claims with prejudice.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the record shows there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The Court must determine whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A fact is "material" if, under the governing law, it could have an effect on the outcome of the lawsuit. *Id.* at 248; *Contreras v. City of Chicago*, 119 F.3d 1286, 1291-92 (7th Cir. 1997). A dispute over a material fact is "genuine" only if a reasonable trier of fact could find in favor of the non-moving party on the evidence presented. *Anderson*, 477 U.S. at 248.

The moving party bears the burden of proving the absence of any genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). To survive a properly supported summary judgment motion, the opposing party must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted). If the parties assert different views of the facts, the Court must view the record in the light most favorable to the nonmoving party. *E.E.O.C. v. Sears, Roebuck & Co.*, 233 F.3d 432, 437 (7th Cir. 2000).

## UNDISPUTED FACTS

### 1. Fitzpatrick's Employment by MSOE and Subsequent Job-Performance Issues.

MSOE is a non-stock, not-for-profit corporation organized under Wisconsin law and located in Milwaukee, Wisconsin. (ECF No. 15.) In December 2014, Fitzpatrick started

working for MSOE as Director of Planned Giving. (ECF No. 30, ¶ 1.) In this role, Fitzpatrick's primary responsibilities included planned gift fundraising and gift portfolio management. (*Id.* ¶ 29.) Fitzpatrick held this position for just over three years, until he was terminated on March 2, 2018. (*Id.* ¶ 74).

Within a few months of being hired, Fitzpatrick's superiors began expressing concerns about his job performance. On July 21, 2015, MSOE's Senior Director of Development, Jonathan Kowalski, met with Fitzpatrick to discuss these concerns. (ECF No. 30, ¶ 3.) Among other things, Kowalski identified concerns about Fitzpatrick's lack of productivity in meeting with donors. (*Id.* ¶ 2.) He also provided Fitzpatrick with materials intended to help him improve. (*Id.* ¶ 4.)

MSOE also began allocating resources to help Fitzpatrick with his job performance and productivity. In the fall of 2015, Kowalski assigned Associate Director of Development Judy Haugsland to help oversee Fitzpatrick's performance. (*Id.* ¶ 7.) Haugsland met with Fitzpatrick in January 2016 to discuss improving his productivity and timeliness. (*Id.* ¶ 9.) The substance of this meeting and Haugsland's concerns are documented in a contemporaneous memo. (ECF No. 34-1.)

On February 23, 2016, just over 14 months after he started, Fitzpatrick's performance issues had not been resolved and MSOE issued him a "First Verbal Warning." (ECF No. 30, ¶ 12.) This verbal warning was a required first step in MSOE's progressive discipline system for employee performance issues. (*Id.* ¶ 11.) Under the system, employees receive increasingly serious levels of discipline: oral warning, written warning, suspension without pay (or a second written warning in lieu of a suspension without pay), and termination. (*Id.*)

The substance of the First Verbal Warning was documented in a memo. (ECF No. 31-5.) In the memo, Fitzpatrick's supervisors describe a "consistent pattern of failure to meet/progress toward meeting expectations, deadlines and goals." (*Id.*) The memo also identifies a number of examples of Fitzpatrick's performance failures, including failing to make progress on meeting productivity goals, frequent office absences, and job responsibilities that were requiring too many reminders from others prior to completion. (*Id.*)

Fitzpatrick acknowledges receiving the verbal warning but downplays the severity of his underperformance. (ECF No. 39, ¶¶ 12-13.) He insists, for example, that he received satisfactory grades in at least some categories and contends he disclosed his weakness in

3

performing what he calls "administrative back office tasks" before he was hired. (*Id.*) He does not dispute, however, that his superiors identified these job performance issues repeatedly during his time at MSOE.

After the First Verbal Warning, Haugsland and Kowalski continued to expend time and resources trying to help Fitzpatrick improve his performance. (ECF No. 30, ¶¶ 15-17.) Both supervisors continued to meet with Fitzpatrick and exchanged emails discussing his job performance. (*Id.* ¶ 17; ECF No. 34-4.) They continued to express concerns, including with his productivity. (ECF No. 30, ¶ 20.) Fitzpatrick's July 2016 annual performance appraisal shows several poor scores, with contemporaneous written comments highlighting ongoing productivity issues and the amount of time Fitzpatrick's performance issues were requiring from management. (*Id.*, ¶ 22; ECF No. 31-7.)

**2. The Goetsch Trust and Fitzpatrick's Concerns over MSOE's Trust Accounting.**

More than a year after he received his First Verbal Warning, Fitzpatrick claims to have first discovered evidence that MSOE was mishandling trust funds. (ECF No. 15.) According to Fitzpatrick, in March 2017, he became concerned that MSOE was making certain payments to Albert H. and Mary Goetsch, the creators of the Albert H. and Mary Goetsch Irrevocable Charitable Remainder Unitrust (Goetsch Trust), out of MSOE's general cash account rather than from trust assets. (*Id.*) The trust documents name MSOE as trustee and require it to make quarterly payments to the Goetsches equal to 10% of the trust's net value. (ECF No. 30, ¶ 78; ECF No. 40-2.)

Fitzpatrick claims he immediately raised his concerns with Dawn R. Thibedeau, MSOE's Vice President of Finance and Chief Financial Officer. (ECF No. 30, ¶ 92.) As the CFO, Thibedeau serves as the trustee of the Goetsch Trust. (ECF No. 39, ¶77.) Fitzpatrick admits that Thibedeau assured him that MSOE was handling the Goetsch Trust properly. (ECF No. 30, ¶ 92.) He also acknowledges that Thibedeau honestly believed this to be true. (*Id.* ¶ 93.) Fitzpatrick, who is neither a lawyer nor accountant, nonetheless disagrees with her assessment. (*Id.* ¶ 92.)

Fitzpatrick also raised these concerns with his boss, Kowalski. (*Id.* ¶ 95.) In a recorded conversation on March 9, 2017, Fitzpatrick told Kowalski of his concerns about the trust payments, but also reported Thibedeau's view that MSOE was acting properly. (*Id.* ¶¶ 95-96.)

4

Kowalski said he was not familiar with the administration of the Goetsch Trust and that he trusted Thibedeau's opinion. (*Id.* ¶ 97.) He directed Fitzpatrick to memorialize his conversation with Thibedeau in writing to "cover [their] asses." (*Id.*) Fitzpatrick did not share his concerns or the audio recording with MSOE's Human Resources department or anyone until February 2018, just before he was fired.[1] (*Id.* ¶ 100.)

MSOE insists its handling of the required trust payments is proper. (*Id.* ¶¶ 82, 86-87.) The school points out that when the trust was created, its assets were valued at $500,000, but by 2018, the trust's assets had grown to a value of over $2,400,000, even with the 10% income payments made to the Goetsches. (*Id.* ¶ 79.) By making payments from MSOE's cash account, which it treated as a loan obligation of the trust, the trust's assets remained intact and continued to grow. (*Id.* ¶ 89.)

### 3. Fitzpatrick's Performance Problems Persist.

In April 2017, Jeffrey N. Snow joined MSOE as Vice President for Development and Alumni Affairs. (ECF No. 30, ¶ 27.) Within months of starting, Snow instituted position descriptions and formal performance metrics for every employee in the Department, including Fitzpatrick. (*Id.*) Fitzpatrick's position description outlined an expected level of productivity across several areas, with a majority of his productivity (60%) dedicated to planned gift fundraising. (*Id.* ¶ 29; ECF No. 31-9.) He was expected to manage a portfolio of 75 to 100 prospects, in addition to completing a minimum of 150 personal visits per year. (ECF No. 30, ¶ 30; ECF No. 31-9.) Productivity and performance were to be measured using a software system called Jenzabar. (ECF No. 30, ¶ 32.)

With these new formalized job performance requirements in place, Fitzpatrick's superiors continued to expend time and energy to assist him. For example, on June 22, 2017, Kowalski emailed Fitzpatrick with an Outlook-based task list to help him keep on schedule with his priorities and activities, particularly those related to his planned giving marketing activities. (ECF No. 34-11.) Snow also met with Fitzpatrick to encourage him to meet the new job expectations. (ECF No. 30, ¶ 34.) In a follow-up email, Snow encouraged Fitzpatrick to "use

---

[1] On July 27, 2017, Fitzpatrick discussed trust issues generally in a meeting with MSOE's Vice President for Development and Alumni Affairs and two Milwaukee-area trust attorneys. Fitzpatrick concedes that nobody scheduled this meeting to discuss the Goetsch Trust and that the meeting concerned the administration of complex charitable gifts generally. Fitzpatrick received no advice from the two attorneys or anybody else at the meeting on the Goetsch Trust. (ECF No. 30, ¶ 99.)

5

the passion and commitment [he has] for MSOE" to reach his job performance metrics for fiscal year 2018, and reiterated a list of 6 primary job tasks that would "lead to a successful year" for Fitzpatrick. (ECF No. 34-12.) Snow also indicated that Kowalski would be developing individualized quarterly plans for each member of the development team and encouraged Fitzpatrick to work effectively with Kowalski, "to respond to his requests in a timely manner and provide the outcome per [Kowalski's] direction." (ECF No. 34-12.)

On June 28, 2017, Fitzpatrick received his annual staff performance appraisal for 2017. (ECF No. 31-11.) Fitzpatrick received scores between 2.0 and 4.0 on a 5.0 scale. (*Id.*) His lowest score, 2.0, was for quality of work. (*Id.*) His evaluators commented: "[Mr. Fitzpatrick's] work product…often require[s] extra levels of review to ensure accuracy, thoroughness and acceptability." (*Id.*) He also received scores of 2.5 on "productivity" and "attitude and initiative." (*Id.*) The June 28, 2017 staff performance evaluation set a number of goals for Fitzpatrick, including completing "a minimum of 150 personal visits per year." (*Id.*)

Several weeks later, on August 1, 2017, Fitzpatrick met with Snow and Kowalski to discuss his job performance. (ECF No. 30, ¶ 39.) This time, they were joined by MSOE's Director of Human Resources Rebecca Ploeckelman. (*Id.*) Notes from the meeting show they discussed a "pattern of not getting work done on time and when it is completed, it's not done well/accurately." (ECF No. 31-13.)

Documentation of Fitzpatrick's performance issues continued. On August 16, 2017, Kowalski emailed Fitzpatrick regarding Fitzpatrick's failure to meet his July productivity targets. (ECF No. 30, ¶ 40.) Fitzpatrick only had 7 personal visits with 6 prospects and Kowalski reminded him that he would need three times that production in August to achieve the goal of 12 personal visits per month. (*Id.*)

### 4. MSOE Issues Further Verbal and Written Warnings Concerning Fitzpatrick's Performance.

When Snow issued the form Job Description for Fitzpatrick's position in June 2017, the description required Fitzpatrick to "develop a comprehensive, cost effective marketing plan" along with "an annual schedule and budget for the marketing plan." (ECF No. 31-9.) On September 21, 2017, Snow emailed Fitzpatrick requesting an update on Fitzpatrick's marketing and communications plan. (ECF No. 31-15.) Snow expressed concerns about making sure the department had a "thoughtful strategy and timeline" in place for its fall 2017 mailing. (*Id.*)

Fitzpatrick responded, promising to generate a summary report by the following Wednesday, September 27, 2017. (ECF No. 31-16.) Notwithstanding this promise, Fitzpatrick did not actually provide the summary or requested report for another five months, until February 2018. (ECF No. 30, ¶ 44.)

On October 27, 2017, with the problems continuing, MSOE issued Fitzpatrick a "Second Verbal Warning." (ECF No. 30, ¶ 47.) A follow-up memo sent to Fitzpatrick describes a "consistent pattern of failure to meet/progress toward meeting assigned timelines and fundraising goals." (ECF No. 31-17.) The memo also identified a detailed list of performance issues, including a failure to meet average monthly and quarterly personal visits with prospective donors, specifically noting a failure to identify viable giving prospects. (*Id.*) The memo identified a series of "minimum expectations" and set a formal meeting date of December 1, 2017. (*Id.*) On October 31, 2017, Fitzpatrick emailed Snow stating: "I will do my best to change and improve." (ECF No. 34-14.)

On December 8, 2017, MSOE issued Fitzpatrick a Written Warning ("First Written Warning") for failing to meet the minimum expectations outlined in the Second Verbal Warning. (ECF No. 31-19). MSOE described how Fitzpatrick had continuously failed to meet his job expectations, performance standards and metrics, and assigned responsibilities, including: (1) failing to conduct a minimum number of in-person visits/develop a strategy to identify viable prospects to promote components of planned giving; (2) failing to produce a detailed marketing plan since at least October 1, 2017; and (3) failing to file expense reports in accordance with MSOE rules. (*Id.*) MSOE set a performance review on January 26, 2018 and provided Fitzpatrick with a Goal Summary Sheet. (*Id.*) The Goal Summary Sheet identified seven goals he was to meet by that date, including (1) conduct a minimum of 18 in-person visits of viable prospects; (2) present a comprehensive marketing plan to Management by December 15, 2017; and (3) file expense and purchasing card reports according to MSOE's Finance Office's deadlines. (ECF No. 31-34.)

Fitzpatrick again failed to comply with the written requirements set by MSOE. Accordingly, on February 2, 2018, MSOE issued Fitzpatrick a "Final Written Warning." (ECF No. 31-23.) The Final Written Warning detailed how Kowalski had provided Fitzpatrick with ongoing assistance and structure, including bi-weekly meetings, weekly task reminders, defined quarterly performance plans, a Goals Summary Report, resources, training, and other requests for

7

progress updates and plans of action.  (*Id.*)  Nevertheless, Fitzpatrick failed to meet the "minimum outcomes for [his] role…" (*Id.*)  The Final Written Warning set a performance review date for March 1, 2018.  (*Id.*)  It reminded Mr. Fitzpatrick to "meet the outcomes that have been defined for you in your job description, annual performance review, previous Warnings…." (*Id.*)  In conjunction with the Final Written Warning, the Department issued Fitzpatrick a February Goals Summary Report outlining 7 goals to meet before March 1, 2018 including:  (1) conduct and document a minimum of 12 in-person visits of viable prospects by February 28, 2018, and (2) by February 12, 2018, present a comprehensive marketing plan to Management, which the Department had requested numerous times since October 1, 2017.  (ECF No. 31-24.)  Fitzpatrick emailed Kowalski, Snow, and Ploeckelman the same day to acknowledge that he would review carefully and comply with his February Goal Summary Report.  (*Id.*)

On February 12, 2018, Fitzpatrick finally submitted his long-overdue marketing plan.  (ECF No. 31-26.)  Although this satisfied the deadline set in Fitzpatrick's February Goals Summary Report, compliance was much later than originally promised and at least one of Fitzpatrick's superiors questioned whether he had plagiarized the plan.  (ECF No. 31-27.)

That same day, Fitzpatrick emailed Ploeckelman in MSOE's Human Resources department.  (ECF No. 34-15.)  Fitzpatrick asserted that his progressive discipline was not the result of his own poor performance but rather the result of being "targeted and retaliated against for over two years now."  (*Id.*)  Ploeckelman promptly responded and set up a meeting for the next day.  (*Id.*)

On February 13, 2018, Fitzpatrick met with Ploeckelman and her assistant Tracy Buczek to discuss his allegations.  (ECF No. 30, ¶ 65.)  Buczek transcribed the meeting.  (*Id.*)  According to the transcript, when asked why he was being retaliated against, Fitzpatrick told Ploeckelman: "I brought in too much business before the new president came in.  What if Jonathan doesn't get the VP job and what if there is not enough space in the department?"  (ECF No. 34-16.)  Fitzpatrick later reiterated:  "I brought in too much business in the first year and became a threat to them."  (*Id.*)  Fitzpatrick believed that department members, notably Kowalski and Haugsland, retaliated by bringing progressive discipline against him because he was too successful at his job and posed a threat to their own job security.  (*Id.*)

During the meeting, Fitzpatrick also referred to concerns with the Goetsch Trust,

8

although the parties dispute the extent of Fitzpatrick's discussion of his concerns about MSOE's handling of the trust. (ECF No. 39, ¶ 68.) According to Ploeckelman, Fitzpatrick mentioned the Goetsch Trust only briefly and did not suggest that Kowalski or anybody else meant to retaliate against him for allegations he made about management of the Goetsch Trust. (*Id.*) Fitzpatrick claims he told Ploeckelman of his "tense" relationship with Kowalski and played a recording of a conversation between the two relating to the trust in which Kowalski stated that he wanted to find a way to "cover our asses." (*Id.*) The next day, Fitzpatrick followed up with an email to Ploeckelman. (ECF No. 34-17.) The email does not mention any alleged retaliation against him due to the Goetsch Trust. (*Id.*)

### 5. Fitzpatrick Reports His Concerns over the Goetsch Trust to the IRS and SEC Just as His Employment Is Being Terminated.

On February 19, 2018, Fitzpatrick sent complaints to the IRS and SEC alleging that MSOE was violating the Goetsch Trust by intentionally withholding approximately $2,200,000 from Goetsch. (ECF No. 30, ¶ 100.) He emailed a copy of the IRS complaint to Snow and Ploeckelman that same day and told them he sent a similar complaint to the SEC. (ECF No. 34-30.) Fitzpatrick emailed Ploeckelman his SEC complaint on March 1, 2018, the day before his termination.[2] (ECF No. 34-23.)

On February 28, 2018, MSOE counted a number of failures in Fitzpatrick's compliance with the requirements set in his February Goal Summary Report. (ECF No. 30, ¶ 72.) Among other failures, MSOE counted only 8 personal visits to donors (the February Goal Summary Report required 12 in-person visits). (*Id.*) On March 2, 2018, MSOE informed Fitzpatrick that it had decided to terminate his employment. (*Id.* ¶ 74.) A follow-up letter from Ploeckelman documented the decision and provided additional information concerning the end of his MSOE employment. (ECF No. 31-30.)

---

[2] Thibedeau received the IRS and SEC complaints after Fitzpatrick provided them to Snow and Ploeckelman. She contacted Baker Tilly to discuss Fitzpatrick's allegations. Baker Tilly came to the same conclusion as before: MSOE's administration of the Goetsch Trust is proper. Thibedeau had no role in the decision to terminate Fitzpatrick.

9

## ANALYSIS

### I. The Undisputed Facts Defeat Fitzpatrick's Dodd-Frank Act Whistleblower Retaliation Claim.

In enacting the Dodd-Frank Act in 1990, Congress established statutory incentives and protections for certain "whistleblowers," a defined set of individuals who report violations of the federal securities laws to the SEC. The act creates a reward or bounty system to encourage individuals to report securities law violations to the SEC. *See* 15 U.S.C. § 78u-6(b). The statute also creates a private right of action to protect "whistleblowers" from retaliation by their employers: "[n]o employer may discharge … or in any other manner discriminate against, a whistleblower in the terms of conditions of employments because of any lawful act done by the whistleblower" in one of three categories. *See* 15 U.S.C. § 78u-6(h).

Fitzpatrick claims MSOE violated these provisions by retaliating against him by terminating his employment after he reported his concerns about the Goetsch Trust to the SEC. (ECF No. 15.) MSOE contends it is entitled to summary judgment on this claim because Fitzgerald cannot establish a viable retaliation claim. (ECF No. 29.)

#### A. Fitzpatrick Can Only Invoke the Dodd-Frank Act Anti-Retaliation Provisions if He Is a "Whistleblower" under the Act.

Before addressing whether Fitzpatrick has marshalled sufficient evidence to survive summary judgment on his retaliation claim, the Court must first confirm that Fitzpatrick is a "whistleblower" entitled to bring a claim under the statute. The Dodd-Frank Act defines "whistleblower" as "any individual who provides … information relating to a *violation of the securities laws* to the [SEC] in a manner established, by rule or regulation, by the Commission." 15 U.S.C. § 78u-6(a)(6) (emphasis added). The Supreme Court has held that "an individual who falls outside the protected category of 'whistleblowers' is ineligible to seek redress under the statute, regardless of the conduct in which that individual engages." *Digital Realty Trust, Inc. v. Somers*, 138 S. Ct. 767, 777 (2018).

In its initial summary judgment briefing, MSOE conceded that Fitzpatrick was a whistleblower for purposes of the statute. (ECF No. 15-31.) In reviewing the record, however, the Court questioned whether Fitzpatrick's report to the SEC related to a securities law violation, as required by the Dodd-Frank Act. Accordingly, on October 5, 2020, the Court set a status

hearing to give the parties a chance to address whether Fitzpatrick was a whistleblower, s*ee* Fed. R. Civ. P. 56(f), and, on October 29, 2020, heard the parties' arguments on the issue.

It is undisputed that Fitzpatrick reported his concerns about MSOE's handling of the Goetsch Trust to the SEC (and the IRS) on February 19, 2018. (ECF No. 30, ¶ 100.) He made his report using the SEC's prescribed form on which he identified MSOE's alleged securities law violation as "fraud." (ECF No. 34-23.) Fitzpatrick also included a narrative attachment describing his concern over MSOE's payment of the Goetsches directly from the school's cash account rather than from the trust assets. (ECF No. 34-23.)

The problem for Fitzpatrick is that, even given a generous reading of his complaint, it is hard to see how MSOE's conduct could possibly be a "violation of the securities laws" as required by the statute. 15 U.S.C. § 78u-6(a)(6). MSOE is not itself a publicly traded entity and its internal processes for paying out dividends from a private trust hardly seems to implicate the federal securities laws. Even if MSOE's payment method violated the trust document or Wisconsin trust law, such a violation would not necessarily (or even likely) be a securities law violation.[3] The Court gave Fitzpatrick the chance to address this issue at the status conference, but his counsel offered nothing new and directed the Court to review his previously filed summary judgment response brief. (ECF No. 69.) The brief offers nothing on this issue. Accordingly, because Fitzpatrick has not established the necessary factual support for a finding that he is a whistleblower under the Dodd-Frank Act, MSOE is entitled to judgment as a matter of law. *See Zillges v. Kenney Bank & Trust*, 24 F. Supp. 3d 795 (E.D. Wis. 2014) (dismissing Dodd-Frank retaliation claim where plaintiff failed to allege or show "his disclosure relates to a violation of federal securities laws.")

### B. Even if Fitzpatrick Was a Protected Whistleblower, His Retaliation Claim Cannot Survive Summary Judgment.

The Seventh Circuit has yet to address the required elements of a Dodd-Frank Act retaliation claim. The parties nevertheless agree that the Court should employ the burden-shifting framework from *McDonnell Douglas Corp v. Green*, 411 U.S. 792 (1973), a long-

---

[3] Perhaps Fitzpatrick is suggesting that MSOE's conduct constitutes fraud by a securities broker or dealer. Such a generous reading would also fail as a legal matter. As an educational charitable organization, even when acting as a trustee, MSOE is likely exempt from the definition of a securities broker or dealer for purposes of the Dodd-Frank Act. *See* 15 U.S.C. §§ 78c(e) (exempting charitable organizations, as defined by 15 U.S.C. § 80a-3(c)(10)(D), when serving as trustee for certain types of trusts, as defined by 15 U.S.C. § 80a-3(c)(10)(B)).

established approach for adjudicating discrimination and retaliation claims under both Title VII of the Civil Rights Act and the Sarbanes-Oxley Act. (ECF No. 29; ECF No. 37.) The SEC has itself suggested that courts use this approach. (*Id.*) Under this framework, a plaintiff must first prove that he engaged in protected whistleblowing, that his employer knew he engaged in protected whistleblowing, and that his whistleblowing was a causal or contributing factor in some unfavorable action taken by the employer. *See Verfuerth v. Orion Energy Systems, Inc.*, 879 F.3d 789, 793 (7th Cir. 2018). Once an employee establishes these prima facie elements, the burden shifts to the employer to show that it would have taken the same unfavorable action even in the absence of the protected whistleblowing. *Id.* If the employer offers evidence of a legitimate basis for its adverse action, the employee must show that the proffered reason is merely pretext. *See Hill v. Tangherlini*, 724 F.3d 965, 968 (7th Cir. 2013); *Roadway Express, Inc. v. United States Department of Labor*, 495 F.3d 477, 482 (7th Cir. 2007).

MSOE argues it is entitled to summary judgment on the retaliation claim because Fitzpatrick cannot show that his termination was caused by his SEC report and because no rational jury could find that MSOE's explanation for the termination—Fitzpatrick's long history of underperformance—was a pretext. (ECF No. 29.) The Seventh Circuit has observed that where an employee relies upon circumstantial evidence to challenge the reason for an adverse employment action and to establish pretext, the analysis of causation and pretext almost necessarily overlap. *See Scruggs v. Garst Seed Co.*, 587 F.3d 832, 838 (7th Cir. 2009).

MSOE points to the voluminous record showing that by the time Fitzpatrick filed his report with the SEC he had been underperforming for years and had already been given a Final Written Warning about his job performance. In these circumstances, MSOE insists, no reasonable jury could conclude that Fitzpatrick's termination was caused by his report to the SEC. Moreover, MSOE argues, the record defeats any suggestion that MSOE's explanation for Fitzpatrick's termination is pretextual.

The record is indeed replete with undisputed evidence of MSOE's concerns about Fitzpatrick's job performance. The record also shows that those concerns were in place long before Fitzpatrick made any report to the SEC. Just seven months after he started at MSOE, Fitzpatrick was receiving feedback from his supervisor, Kowalski, about a lack of productivity. Thereafter, for a period of more than two and a half years, Fitzpatrick's superiors consistently expressed concerns about his poor productivity and failure to meet timelines. Fitzpatrick's

performance issues were documented in his 2016 and 2017 annual performance reviews. And, under MSOE's progressive discipline system, he received formal verbal warnings in July 2016 and October 2017. When he failed to comply with the requirements of his second verbal warning, MSOE gave him a First Written Warning on December 8, 2017. When he failed to bring himself into compliance, he ultimately received a Final Written Warning on February 2, 2018. It was only after all of these documented instances of continued underperformance, on the brink of termination, that Fitzpatrick filed his report with the SEC.

Fitzpatrick concedes that he must show that his SEC report was a "but for" cause for his termination. He does not offer direct evidence that MSOE's decision to fire him was caused by his communication to the SEC; no documents or testimony indicate that Fitzpatrick was terminated because of his SEC or IRS filings. Instead, he insists that "various scraps" of circumstantial evidence in the record are sufficient to create a jury issue on causation and pretext. (ECF No. 37.)

Fitzpatrick's discussion of the circumstantial evidence downplays the voluminous evidence of his performance issues. He argues that he received positive grades on some, but not all, of the areas of his performance. (*Id.*) None of these efforts erase the undisputed fact that Fitzpatrick's supervisors consistently viewed him as underperforming in key, required aspects of his job, including productivity. That his supervisors did not think he was performing terribly in all aspects of his job does not bring into question the veracity of their criticisms of his performance. The Seventh Circuit has emphasized that courts are not to second-guess an employer's good faith decision to terminate an employee for poor performance. *See Balance v. City of Springfield*, 424 F.3d 614, 621 (7th Cir. 2005).

Fitzpatrick argues that one of the areas of his poor performance—his failure to log calls with donors into MSOE's "Jenzabar" computer system—was not the result of his own failures but rather was caused by an unidentified person's alleged tampering with the system. He offers no evidence to corroborate this accusation, but, even if he did, it does nothing to discredit the mountains of other evidence of his performance problems. Indeed, the record shows Fitzpatrick acknowledging many of his shortcomings and performance failures over the two years preceding his ultimate termination. *See Faas v. Sears*, *Roebuck & Co.*, 532 F.3d 633, 642-43 (7th Cir. 2008) (affirming summary judgment for employer based on extensive record of poor performance).

13

Fitzpatrick next contends that his long history of poor performance cannot have been the cause of his termination because his termination letter refers "only" to his failure to meet the minimum performance expectations for February 2018. (ECF No. 37.) But the termination letter was not drafted and should not be read in isolation. Fitzpatrick ignores the context in which the termination letter arose, including the many previous verbal and written warnings that MSOE issued Fitzpatrick. As clearly indicated in the record, MSOE's expectations for Fitzpatrick in February 2018 were directly related to the Final Written Warning that Fitzpatrick received on February 2, 2018. MSOE's reference to merely the last of many years of performance failures in finally terminating his employment is not circumstantial evidence that MSOE's justification is untrustworthy.

The only circumstantial evidence supporting Fitzpatrick's retaliation claim is timing. His termination occurred just eleven days after he filed his SEC complaint. While "suspicious timing" can be circumstantial evidence of retaliation, the Seventh Circuit has made clear that temporal proximity in timing alone is almost never enough to create a genuine issue of material fact. *See Tomanovich v. City of Indianapolis*, 457 F.3d 656 (7th Cir. 2006). Given the long and well-documented history of MSOE's concerns with Fitzpatrick's performance, coupled with the fact that the school gave Fitzpatrick a Final Written Warning before he made his SEC report, the timing is not suspicious. It is, in fact, more suspicious that Fitzpatrick did not report his concerns to the SEC until he had already been given final notice that he was at risk of being fired.

Fitzpatrick also argues that his performance problems are a ruse created by MSOE to cover up its real reason for firing him—his discovery of the mishandling of the Goetsch Trust. This argument is logically flawed. Assuming Fitzpatrick is a whistleblower under the Dodd-Frank Act, the whistleblower protections only prevented MSOE from terminating Fitzpatrick after his February 19 report to the SEC. *See Digital Reality Trust, Inc.*, 138 S. Ct. at 778. At all times before that, he was an at-will employee and MSOE needed no "ruse" to justify terminating his employment. The record is replete with evidence of performance issues well before Fitzpatrick's SEC report. Indeed, his performance problems preceded his first mention of any concern about the Goetsch Trust.

Finally, Fitzpatrick asserts that MSOE has attempted "to paint a false picture of an employee who consistently failed his job requirements." (ECF No. 37.) He argues that evidence that an employer lied about the reasons for an adverse employment action permits a trier of fact

14

to infer retaliatory animus. (*Id.*) But Fitzpatrick offers no evidence on any misrepresentations from any of his MSOE supervisors. He simply calls MSOE's extensive record of his poor performance a "false narrative." Such conclusory statements are not enough to cast doubt on the record or to create a genuine issue of material fact. *See Boston v. U.S. Steel Corp.*, 816 F.3d 455, 465 (7th Cir. 2016) (rejecting employee's attempt to characterize performance issue as insignificant without evidence of employer's dishonesty).

Fitzpatrick has not marshalled direct or circumstantial evidence sufficient to avoid summary judgment. Given the undisputed facts, no reasonable jury could conclude that Fitzpatrick's March 2, 2018 termination was caused by his February 19, 2018 reporting to the SEC. Nor could a reasonable jury find that MSOE's stated reason for firing Fitzpatrick—his long record of poor performance—was mere pretext. By the time he sent his report to the SEC, the record establishes that Fitzpatrick was already on the brink of termination. MSOE is entitled to summary judgment on the whistleblower claim.

## II. The Record Does Not Support Fitzpatrick's Wisconsin Wrongful Discharge.

MSOE contends it is also entitled to summary judgment on Fitzpatrick's wrongful discharge claim. Wisconsin is an at-will employment jurisdiction, allowing employers to terminate employees "for good cause, for no cause, or even for cause morally wrong, without being thereby guilty of legal wrong." *Runzheimer Int'l, Ltd. v. Friedlen*, 862 N.W.2d 879, 889 (Wis. 2015) (quoting *Brockmeyer v. Dun & Bradstreet*, 335 N.W.2d 834, 837 (Wis. 1983) (internal quotations and citation omitted)). Fitzpatrick's alternate, wrongful discharge claim is premised on an exception to that general rule, but the facts do not support Fitzpatrick's argument.

In *Brockmeyer*, the Wisconsin Supreme Court adopted "a narrow public policy exception" to at-will employment. 335 N.W.2d at 840. Under this narrow exception, an employee can pursue a claim for wrongful discharge "when the discharge is contrary to a fundamental and well-defined public policy." *Id.* In order to pursue a claim for wrongful discharge under this narrow exception, an employee must: "(1) first identify a fundamental and well defined public policy in their complaint sufficient to trigger the exception to the employment-at-will doctrine; and (2) then demonstrate that the discharge violated that fundamental and well defined public policy." *Strozinsky v. School Dist. of Brown Deer*, 614 N.W.2d 443, 453 (Wis. 2000) (citing *Winkelman v. Beloit Mem'l Hosp.*, 483 N.W.2d 211 (Wis.

15

1992); *Wandry v. Bull's Eye Credit Union*, 384 N.W.2d 325 (Wis. 1986)).  If the plaintiff can satisfy the first two steps, the burden shifts to the employer to show just cause for the discharge. *Winkelman*, 483 N.W.2d at 216.

Whether Fitzpatrick has identified "a fundamental and well-defined public policy" is a question of law that must be decided by the Court.  *Winkelman*, 483 N.W.2d at 216 (citing *Brockmeyer*, 335 N.W.2d at 841).  Fitzpatrick states that Wis. Stat. §§ 701.0105(2)(b), 701.0801, and 701.0406 establish a "clear public mandate to eradicate the possibility that a trustee will self-deal, misappropriate trust funds, withhold information, or fail to act in the sole interests of the beneficiary." (ECF No. 37.)  Although the Court agrees that the statutes identify a public policy, in this situation, this policy does not "trigger the exception to the employment-at-will doctrine" for Fitzpatrick.  *Strozinsky*, 614 N.W.2d at 453.  Therefore, Fitzpatrick has not satisfied the first prong of the analysis and his claim must be dismissed.

The types of public policies that allow an employee to pursue a wrongful discharge claim are "very narrow," and "not every statutory, constitutional, or administrative provision invariably sets forth a clear mandate of public policy."  *Id.* at 454.  When determining whether an identified public policy triggers the exception to at-will employment, the Wisconsin Supreme Court has routinely required that the employer force the employee to "violate a constitutional or statutory provision."  *Id.* at 456 (citing *Bushko v. Miller Brewing Co.*, 396 N.W.2d 167, 170 (Wis. 1986)).  For example, in *Strozinsky*, the Wisconsin Supreme Court allowed a plaintiff to pursue a wrongful discharge claim when her employer required her to "falsify payroll documentation and defraud taxing authorities."  *Id.* at 457 (internal quotations omitted).  In *Winkelman*, a nurse was allowed to pursue a wrongful discharge claim when her employer required her to perform services for which she was not qualified.  483 N.W.2d at 218.  In both cases, the plaintiffs were required by their employers to violate Wisconsin or federal statutes.

In contrast to *Winkelman* and *Strozinsky*, the Wisconsin Supreme Court has not allowed plaintiffs to pursue wrongful discharge claims when they were not the one being asked to violate any public policies.  In *Bushko*, the plaintiff alleged that he was terminated for complaints about plant safety, hazardous waste disposal procedures, and the dishonest conduct of his superiors.  396 N.W.2d at 168-69.  The court held that merely complaining to your employer that various practices may violate public policy is not enough to pursue a wrongful discharge claim.  *Id.* at 172.  Instead, the employer must require the employee "as a condition of employment to act in

16

an unlawful manner." *Id.*

In his complaint, Fitzpatrick states that he was terminated for "refus[ing] to violate the clear mandates of public policy promulgated by *Wis. Stat.* §§ 701.0105(2)(b) and 701.0406." (ECF No. 15.) However, neither of those statutes relate to Fitzpatrick's duties at MSOE. Both statutes control the creation and management of trusts in the state of Wisconsin. *See* Wis. Stat. §§ 701.0105(2)(b), 701.0406. Thibedeau, not Fitzpatrick, is the trustee of the Goetsch Trust. Like the plaintiff in *Bushko*, even if Fitzpatrick is correct that MSOE is mishandling the trust, Fitzpatrick is not the one being asked to violate public policy. Accordingly, even if Fitzpatrick was discharged for raising complaints about the management of the Goetsch Trust, and not for his poor performance, his situation does not trigger an exception to at-will employment, and he cannot pursue a wrongful discharge claim.

## CONCLUSION

In conclusion, defendant's motion for summary judgment must be granted. Fitzpatrick cannot be a "whistleblower" under the Dodd-Frank Act. However, even if he is a "whistleblower," no reasonable jury could conclude that his termination was for anything but his poor performance. Since Fitzpatrick has failed to demonstrate a public policy that was violated when he was terminated by MSOE, he also cannot pursue a Wisconsin wrongful discharge claim.

Accordingly, IT IS HEREBY ORDERED that defendant's motion for summary judgment, (ECF No. 28), is GRANTED and the plaintiff's case is DISMISSED with prejudice.

Dated at Milwaukee, Wisconsin on December 2, 2020.

s/ Brett H. Ludwig
BRETT H. LUDWIG
United States District Judge